IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA16-398

 Filed: 21 February 2017

Bertie County, No. 01 CRS 54023

STATE OF NORTH CAROLINA

 v.

TERRENCE LOWELL HYMAN, Defendant.

 Appeal by defendant from order entered 12 May 2015 by Judge Cy A. Grant in

Bertie County Superior Court. Heard in the Court of Appeals 5 October 2016.

 Attorney General Joshua H. Stein, by Assistant Attorney General Mary Carla
 Babb and Nicholaos G. Vlahos, for the State.

 Appellate Defender Glenn Gerding, by Assistant Appellate Defender Nicholas
 C. Woomer-Deters, for defendant-appellant.

 ELMORE, Judge.

 On 16 September 2003, Terrence Lowell Hyman (defendant) was convicted of

first-degree murder and sentenced to life in prison without parole. After a series of

post-trial motions and appeals in state and federal court, defendant filed a motion for

appropriate relief in Bertie County Superior Court claiming, inter alia, that he was

denied his right to effective assistance of counsel based upon his trial counsel’s failure

to withdraw and testify as a necessary witness. The trial court denied defendant’s

motion.
 STATE V. HYMAN

 Opinion of the Court

 We allowed defendant’s petition for writ of certiorari to review the trial court’s

order denying his motion for appropriate relief. Upon review, we hold the trial court

erred in concluding that (1) defendant’s exculpatory witness claim was procedurally

barred under N.C. Gen. Stat. § 15A-1419(a); (2) defendant’s exculpatory witness claim

had no evidentiary support; and (3) defendant could demonstrate neither deficient

performance nor prejudice which would entitle him to relief under Strickland v.

Washington, 466 U.S. 668, 687 (1984). Reversed.

 I. Background

 On 30 July 2001, a Bertie County grand jury indicted defendant for the murder

of Ernest Lee Bennett Jr., who was shot and killed during a brawl at a crowded

nightclub. The trial court appointed Teresa Smallwood and W. Hackney High to

represent defendant. He was tried capitally at the 25 August 2003 Special Criminal

Session in Bertie County Superior Court, the Honorable Cy A. Grant presiding.

 At trial, the State offered testimony from two eyewitnesses, Robert Wilson and

Derrick Speller, who both testified that defendant shot Bennett. Wilson testified that

he saw defendant enter the nightclub with a .380 caliber handgun. A few seconds

later, Wilson heard two gunshots inside and saw Bennett run out of the door. A man

following Bennett hit him in the head with a bottle, knocking him out. As Bennett

lay on the ground, Wilson saw defendant exit the nightclub and shoot Bennett four

times.

 -2-
 STATE V. HYMAN

 Opinion of the Court

 Speller testified that defendant walked into the nightclub with a handgun and

shot Bennett during the fight. Bennett ran toward the door, clenching his side as

defendant continued to shoot. Speller followed out the main entrance where he saw

Bennett lying on the ground. He watched defendant kneel over Bennett and shoot

him again. As Speller ran toward his car, he heard more gunshots behind him. He

turned and saw another man, Demetrius Jordan, shooting a nine-millimeter handgun

into the air.

 The State’s medical examiner, Dr. Gilliland, testified that Bennett had four

gunshot wounds and blunt force injuries to his scalp. Bennett was shot in the back

of his head, the right side of his back, the left side of his back, and his left buttock.

According to Dr. Gilliland, either of the two wounds to Bennett’s back would have

been fatal. A .380 caliber bullet was recovered from the wound to the right side of

Bennett’s back. Law enforcement found two .380 caliber casings inside the nightclub.

More .380 caliber casings and bullets were recovered outside along with six nine-

millimeter casings.

 At the close of the State’s evidence, defendant offered testimony from two

witnesses, Lloyd Pugh (L. Pugh) and Demetrius Pugh (D. Pugh), who testified that

defendant was not the shooter. L. Pugh, the owner of the nightclub, testified that he

heard two gunshots ring out as he was trying to break up the fight. When the shots

were fired, he was “looking at [defendant] telling him you all get out of here.”

 -3-
 STATE V. HYMAN

 Opinion of the Court

Defendant did not have a gun. L. Pugh saw defendant and Bennett leave and heard

more gunshots coming from outside. At that point or shortly thereafter, L. Pugh ran

into defendant at the door as defendant was coming back inside to tend to his cousin,

who had been knocked out during the fight. Defendant was still unarmed.

 D. Pugh testified that he saw Demetrius Jordan shoot Bennett inside the

nightclub with a .380 caliber handgun. Jordan shot Bennett again as Bennett broke

for the door and two more times outside. Jordan then retrieved a nine-millimeter

handgun from his car and shot Bennett one last time before firing the remaining

rounds into the air. D. Pugh never saw defendant with a gun. He testified that

defendant had already left through the back door when Jordan first shot Bennett

inside the nightclub.

 Derrick Speller’s Cross-Examination

 When the State called Speller to testify at trial, Smallwood informed High for

the first time that she had interviewed Speller. She previously represented Speller

in an unrelated probation matter and, around that time, had spoken to him about

defendant’s case. During recess after Speller’s direct examination, Smallwood

retrieved a set of handwritten notes dictating their conversation:

 11/20/01 Derrick Speller
 Saw the whole thing
 Demet had a .380 and a 9 mm.
 He shot the guy and then ran out the back door
 Somebody else shot at the guy with a chrome looking small
 gun but “I don’t know who it was.”

 -4-
 STATE V. HYMAN

 Opinion of the Court

 “I heard Demetrius shot him again outside but I don’t know
 for sure.”
 “I think it was a 9 mm he (Demet) had outside.[”]
 Never gave a statement to police because he hustled for
 Demet and Turnell and them niggers are lethal.
 Can you shoot me a couple of dollars.

Smallwood attempted to cross-examine Speller about their conversation to show that

Speller had previously identified Demetrius Jordan as the shooter. Speller conceded

that he spoke with Smallwood about the case before trial but denied making any of

the statements reflected in her notes. He testified: “I told you at that time that I

couldn’t help you on this case, that I would harm [defendant] more than I could help

him if I was brought on the stand to testify. That’s the only conversation that you

and I ever had about this case.” The trial court did not allow Smallwood to show

Speller her notes from the conversation or to admit the notes into evidence at trial.

 First Appeal: Hyman I

 After his conviction, defendant filed his first appeal with the North Carolina

Court of Appeals. State v. Hyman (Hyman I), No. COA04-1058, 2005 WL 1804345

(N.C. Ct. App. Aug. 2, 2005). As characterized by the Court, defendant argued that

the trial court failed to conduct a hearing when it became aware of a potential conflict

of interest on the part of Smallwood, who had previously represented Speller in an

unrelated case. Id. at *4. The Court determined:

 Although the trial court was made aware of this
 representation, the trial court failed to conduct an inquiry
 and “ ‘determine whether there exist[ed] such a conflict of

 -5-
 STATE V. HYMAN

 Opinion of the Court

 interest that . . . defendant [would have been] prevented
 from receiving advice and assistance sufficient to afford
 him the quality of representation guaranteed by the [S]ixth
 [A]mendment.’ ”

Id. at *5 (citing State v. James, 111 N.C. App. 785, 791, 433 S.E.2d 755, 758 (1993)).

Because the Court could not “find from the face of the record that defendant’s

attorney’s prior representation of Speller affected her representation of defendant,”

however, it remanded “for an evidentiary hearing to determine if the actual conflict

adversely affected [Smallwood’s] performance.” Id. at *6 (citation and internal

quotation marks omitted).

 Evidentiary Hearing on Remand

 The evidentiary hearing was held on 3 October and 2 November 2005 before

Judge Grant. Defendant and his trial counsel, Smallwood and High, were all present.

The trial court had determined it was in defendant’s best interest to have new counsel

for the hearing and appointed Jack Warmack to represent him.

 Warmack had previously represented Telly Swain, a co-defendant charged

with Bennett’s murder. The State eventually dropped the first-degree murder charge

as part of a plea agreement in which Swain pleaded guilty on two lesser offenses and

agreed “to testify truthfully against any co-defendant upon request by the State.” On

Warmack’s advice, Swain also gave a written statement to police implicating

defendant in the murder but Swain did not testify at trial.

 -6-
 STATE V. HYMAN

 Opinion of the Court

 Warmack expressed concern over the potential conflict of interest arising from

his prior involvement in the case. He informed defendant that he had represented

Swain and contacted the State Bar. Warmack ultimately determined he had no

conflict of interest because he viewed his role at the remand hearing as a limited one:

“I didn’t think my purpose was to establish that there were—there was no conflict,

but to get what [Smallwood] had to say about it on the record so the Court of Appeals

could determine whether in their opinion there was a conflict or not.” If his

appointment had required him to conduct his own investigation to prove that

Smallwood had an actual conflict of interest, Warmack explained, then he himself

would have been “conflicted out.”

 At the evidentiary hearing, Smallwood testified about her interaction with

Speller leading up to defendant’s trial. Speller had retained Smallwood’s law partner,

Tonza Ruffin, to represent him on a probation violation matter and at some point

Smallwood stepped in for Ruffin to enter a plea on defendant’s behalf. Smallwood

testified that the scope of her representation in the matter lasted “maybe five or ten

minutes.” During that time, Smallwood did not speak to Speller about defendant’s

case. She insisted “there was nothing as a result of my representation of [Speller]

that I would have obtained regarding [defendant].” Smallwood explained that the

conversation with Speller which she alluded to at trial “took place from an

 -7-
 STATE V. HYMAN

 Opinion of the Court

investigatory standpoint” after her representation of Speller and incident to her

preparation for defendant’s trial.

 During a recess of the hearing, Judge Grant spoke with the deputy clerk of

court about the dates of Speller’s probation violation matter. The records indicated

that Speller was served with an order of arrest on 18 July 2002 and he appeared in

court for a hearing on 26 September 2002. Ruffin was listed as the attorney of record

but Smallwood had represented Speller at the hearing. Smallwood was appointed to

represent defendant on 14 May 2001.

 The trial court entered an order on 28 November 2005 following the

evidentiary hearing. In its order, the trial court found:

 12. That Ms. Smallwood never spoke with Derrick Speller
 about his case prior to September 26, 2002 and only spoke
 with him five or ten minutes prior to the violation hearing.

 13. That Attorney Smallwood during her five to ten-minute
 conversation with Derrick Speller never spoke with
 Derrick Speller concerning any matter relating to her
 representation of Terrence Hyman.

 14. During her five to ten-minute conversation with
 Derrick Speller Attorney Smallwood did not obtain any
 information for or about Derrick Speller that she could
 have used to impeach or attack Derrick Speller’s credibility
 as a witness during the trial of the defendant Terrence
 Hyman.

The court ultimately concluded that Smallwood’s representation of defendant was not

adversely affected by her previous representation of Speller.

 -8-
 STATE V. HYMAN

 Opinion of the Court

 Second Appeal: Hyman II

 Defendant appealed the order to the North Carolina Court of Appeals, arguing

that the trial court erred in concluding Smallwood’s prior representation of Speller

did not adversely affect her representation of defendant. State v. Hyman (Hyman II),

No. COA06-939, 2007 WL 968753, at *3 (N.C. Ct. App. Apr. 3, 2007). The Court

affirmed the order because the uncontested findings showed, inter alia, that there

was no overlap of representation, and that during her representation of Speller,

Smallwood did not obtain any information about defendant from Speller that she

could have used to impeach him at trial. Id. at *4–5. The North Carolina Supreme

Court denied defendant’s petition for writ of certiorari. State v. Hyman, 362 N.C.

685, 671 S.E.2d 325 (2008).

 Writ of Habeas Corpus in U.S. District Court

 Defendant filed a petition for writ of habeas corpus in the U.S. District Court

for the Eastern District of North Carolina pursuant to 28 U.S.C. § 2254. See Hyman

v. Beck, No. 5:08-hc-02066-BO (E.D.N.C. Mar. 31, 2010). Defendant maintained that

his Sixth Amendment right to effective assistance of conflict-free counsel was

violated. The state court’s decision to the contrary, he argued, was an objectively

unreasonable application of clearly established federal law to the facts of his case.

 Granting defendant’s petition, the court first concluded that defendant had

exhausted “his state remedies for purposes of § 2254 because the North Carolina

 -9-
 STATE V. HYMAN

 Opinion of the Court

Court of Appeals [and] the North Carolina Supreme Court were given a ‘full and fair

opportunity’ to consider the substance of his claim.” The court focused its substantive

discussion on whether Smallwood had a conflict of interest in that she could have

served as a material witness at defendant’s trial and, in her role as counsel, her

questions on cross-examination could not be considered evidence. The attorney-client

privilege, the court noted, was not at issue because the lower court found that

Smallwood did not obtain any information from Speller about defendant during her

representation of Speller.

 Guided by Cuyler v. Sullivan, 446 U.S. 335 (1980), the court concluded that

defendant was entitled to relief and vacated his conviction. The court explained that

Smallwood “became a material witness with a conflict of interest” when Speller

“testified in direct contravention to a conversation she had with him and for which

she had taken contemporaneous notes.” Smallwood ignored that her testimony “may

have changed the outcome of trial” and chose instead “to continue as counsel in light

of the need to testify herself and proffer impeaching testimony.” Because

“Smallwood’s actual conflict of interest adversely affected her performance,”

defendant was denied his Sixth Amendment right to effective assistance of conflict-

free counsel and any contrary conclusion by the state courts “was an objectively

unreasonable application of clearly established federal law to the facts of his case.”

 Appeal to the U.S. Court of Appeals for the Fourth Circuit

 - 10 -
 STATE V. HYMAN

 Opinion of the Court

 The State appealed the district court’s order granting the writ of habeas

corpus, contesting both the substance and procedural posture of defendant’s Sixth

Amendment claim in federal court. Hyman v. Keller, No. 10-6652, 2011 WL 3489092,

at *8 (4th Cir. Aug. 10, 2011). The State argued that defendant “procedurally

defaulted federal review” because he “did not fairly raise the exculpatory witness

component in the North Carolina courts.” Id. at *8–9. The Fourth Circuit agreed

that defendant had failed to exhaust his federal claim:

 [N]either the Court of Appeals nor the Supreme Court of
 North Carolina has directly confronted the procedural or
 substantive propriety of the exculpatory witness
 component. Instead, the court of appeals decisions in
 Hyman I and Hyman II each focused on the dual
 representation conflict issue, and the state supreme court
 summarily denied Hyman’s petition for certiorari.

 Unfortunately, the basis for the North Carolina courts’ lack
 of attention to the exculpatory witness conflict is unclear—
 perhaps they did not consider that component of Hyman’s
 Sixth Amendment claim to be fairly presented, perhaps
 they meant to implicitly reject it on the merits, or perhaps
 they simply overlooked it.

Id. at *9–10. In reaching its disposition, the Fourth Circuit explained that dismissing

without prejudice “mixed” habeas petitions, i.e., those involving both exhausted and

unexhausted constitutional claims, “is no longer a feasible option for a federal court,

in that the § 2254 petition could ultimately be adjudged time-barred under [the

Antiterrorism and Effective Death Penalty Act of 1996].” Id. at *10. The court

 - 11 -
 STATE V. HYMAN

 Opinion of the Court

decided, based on the unusual circumstances of the case, “to employ the ‘stay and

abeyance procedure’ approved by the Supreme Court in connection with unexhausted

§ 2254 claims.” Id. (citing Rhines v. Weber, 544 U.S. 269, 275–78 (2005)). Accordingly,

the court stayed the appeal “to provide the North Carolina courts with an opportunity

to weigh in on the procedural and substantive issues.” Id. at *11.

 Motion for Appropriate Relief

 After the Fourth Circuit’s decision, defendant filed a motion for appropriate

relief (MAR) in Bertie County Superior Court. In defendant’s first and principal

claim, characterized by the trial court as “Claim 1,” he argued that his “Sixth

Amendment right to effective, conflict-free counsel was violated because one of his

trial attorneys was also a crucial defense witness who did not testify due [to] her

conflict as his attorney.” He separated his claim further into three components,

maintaining that each independently entitled him to relief: (a) “Smallwood had a

conflict between her duties to her former client, the State’s witness, and her duties to

[defendant] (‘the prior representation component’)”; (b) “Smallwood had a conflict in

that she was a critical witness for [defendant] but could not testify because she was

his attorney (‘the witness component’)”; and (c) “there was a conflict between

[defendant’s] interest in having Smallwood withdraw and present impeachment

evidence against a key State’s witness and Smallwood’s own financial interest in

remaining on [defendant’s] case (‘the financial component’).”

 - 12 -
 STATE V. HYMAN

 Opinion of the Court

 An evidentiary hearing for defendant’s MAR was held on 3 June 2014 before

Judge Grant in Hertford County Superior Court.1 Defendant was present,

represented by attorneys Mary Pollard and Nicholas C. Woomer-Deters, and offered

testimony from W. Hackney High, defendant’s trial counsel; Tonza Ruffin,

Smallwood’s law partner; Andrew Warmack, defendant’s counsel from the

evidentiary hearing; and Ravi Manne, an attorney with North Carolina Prisoner

Legal Services. Despite his efforts, defendant was unable to produce Smallwood as a

witness. Smallwood was disbarred almost three and a half years after defendant’s

trial for separate misconduct and had since left the state.

 Ruffin’s testimony tended to authenticate Smallwood’s notes and confirm

Smallwood’s purported conversation with Speller. Prior to defendant’s trial, Ruffin

was “under the impression that [Derrick] Speller had information that would be

helpful to the case.” She was familiar with Smallwood’s handwriting and identified

the notes dated 20 November 2001 with Speller’s name at the top as those written by

Smallwood. She did not remember being present when the notes were written but

she was present when Speller and Smallwood met in the parking lot of her law office:

 A. I remember him coming having [sic] a conversation. I
 remember believing that he was going to be helpful to Ms.
 Smallwood. But I don’t remember the exact conversation.

 THE COURT: Do you remember anything Teresa may
 have said to you after he left about what he may have said?

1The State and defendant had both consented to a change of venue from Bertie County to Hertford
County.

 - 13 -
 STATE V. HYMAN

 Opinion of the Court

 A. Yes.

 THE COURT: Go ahead.

 A. I remember him—I mean, I remember Teresa saying
 that he claimed that he saw everything. I remember him—
 I don’t remember her seeking him out. I remember him
 seeking her out saying that basically I can help you; I was
 there that night; I saw everything that went down.

 BY MS. ASBELL:

 Q. And that’s your memory of what Ms. Smallwood told
 you?

 A. That’s my memory of what Ms. Smallwood told me and
 that’s my memory of his attitude when he was in the
 parking lot that day. But I can’t tell you verbatim what he
 said in the parking lot. But he definitely wanted to be
 helpful in the case.

Ruffin later testified that Speller “came over on other occasions” but she did not

participate in those meetings.

 During Ruffin’s cross-examination, the State presented a copy of Smallwood’s

time sheet, which showed no entry for 20 November 2001 and no entry for an

interview of Derrick Speller. (There was a 30 November 2001 entry for “file review,

witness interview.”) Ruffin confirmed that attorneys submit their time sheets with

Indigent Defense Services (IDS) to be paid and agreed that Smallwood’s entries were

otherwise “very specific.” But when asked if she would list “every single thing that

you do” for a client, Ruffin replied, “We try to but a lot of times we don’t.” Later at

 - 14 -
 STATE V. HYMAN

 Opinion of the Court

the hearing, Manne offered his own opinion about the time sheets: “I don’t know that

I would view the time sheets as controlling. I know for my time keeping [ ] I don’t put

everything on the exact date at the same time.”

 High testified about his professional relationship with Smallwood and how the

events involving Speller unfolded at trial. High and Smallwood had some problems

when they first began working on defendant’s case. There was even an occasion when

Smallwood attempted to have High removed as co-counsel but they “were able to put

that aside” and work together “fairly well” from that point forward. Prior to trial,

High had some indication that Speller would testify against defendant. Because

Speller never provided a written statement to police, however, High did not know

“specifically what [Speller] was going to say.”

 High and Smallwood initially agreed that High would cross-examine Speller if

the State called him as a witness. High explained that they had divided the witness

list in a way “that would even out the work” but if Smallwood “had a particular

knowledge of a witness or what their style was she might say well it’s better for me

to handle this one, why don’t you get the next one.” That plan changed in a “spur of

the moment decision” when Smallwood revealed to High that she had previously

spoken to Speller. High testified:

 We do our best to anticipate the witness order that the
 state will call the witnesses in. But you never know for
 sure and so it’s always a crapshoot until you actually hear
 the District Attorney say the next witness who will be

 - 15 -
 STATE V. HYMAN

 Opinion of the Court

 called will be so and so.

 So when [Derrick] Speller’s name was called as the next
 witness in that manner, Ms. Smallwood kind of leaned over
 to me and said don’t worry about this one, I’ve got it.

High recalled Smallwood leaving court during recess and returning from her office

with several documents. She told High that she had notes from a prior conversation

with Speller, and she would use her notes to impeach Speller on cross-examination.

 The trial court also heard arguments at the hearing on the admissibility of

Smallwood’s testimony had it been offered at trial. The State argued that

Smallwood’s testimony would not have been admissible because once Speller denied

the conversation, Smallwood was “stuck” with his answer and could not introduce

extrinsic evidence as to what Speller allegedly told her. And even if she had

withdrawn to take the stand, the extent of her permissible testimony would have

been: “[Derrick] Speller told me something different than what he testified to.”

Defendant, in response, argued that Smallwood’s testimony would have been

admissible because it went to a material fact in issue, i.e., the identity of the shooter.

 After the hearing, the trial court notified the parties in writing that it would

enter an order denying defendant’s MAR. As the sole basis for its denial, the court

concluded that “Smallwood could not have testified about Derrick Speller’s prior

inconsistent statement to her, and introduced her notes or the conversation where he

made that statement, after Derrick Speller denied making the statement on cross-

 - 16 -
 STATE V. HYMAN

 Opinion of the Court

examination.” The court thereafter adopted a forty-five-page order, prepared by the

State, denying all claims within defendant’s MAR.

 Notably, the trial court made the following findings in its order regarding the

alleged conversation between Smallwood and Speller:

 32. Defendant presented no credible evidence that the
 conversation which Ms. Smallwood claimed she had with
 Speller ever took place.

 33. Defendant presented no credible evidence that
 Defendant’s MAR Exhibit 1 contained, as he purported,
 notes taken contemporaneously with any conversation
 between Ms. Smallwood and Speller.

 34. Defendant presented no credible evidence that the
 purported conversation between Ms. Smallwood and
 Speller took place on the date appearing on Defendant’s
 MAR Exhibit 1, i.e., November 20, 2001.

 35. Given the evidence presented at the MAR evidentiary
 hearing, the Court cannot definitely find based only upon
 Defendant’s MAR Exhibit 1 and Ms. Smallwood’s cross-
 examination of Speller at Defendant’s trial that Ms.
 Smallwood wrote the notes admitted as Defendant’s MAR
 Exhibit 1 contemporaneously with any conversation she
 had with Speller; that the purported conversation took
 place on the date appearing on the exhibit, i.e., November
 20, 2001; or that the conversation ever took place.

Although the court recognized the significance of Ruffin’s testimony at the hearing,

evidence that Smallwood’s time sheet contained no entry for 20 November 2001 and

that High did not learn about the conversation until trial both indicated to the court

that the conversation never took place.

 - 17 -
 STATE V. HYMAN

 Opinion of the Court

 Regarding defendant’s Claim 1(b) (the “exculpatory witness claim”), the trial

court concluded that defendant’s claim was procedurally barred under N.C. Gen.

Stat. § 15A-1419(a) and, alternatively, without merit. Applying the standard set

forth in Strickland, 466 U.S. at 687, the court concluded that defendant could

demonstrate neither deficient performance nor prejudice based upon Smallwood’s

failure to withdraw and testify as a witness. And to the extent Sullivan, 446 U.S. at

350, applied to defendant’s exculpatory witness claim, the court concluded that the

claim was still meritless because he “failed to present evidence establishing that any

actual conflict of interest existed which had an adverse effect on Ms. Smallwood’s

representation of defendant.”

 Defendant filed a petition for writ of certiorari, which we allowed, seeking

review of the trial court’s order denying his MAR. Defendant contends that (1) he

was not procedurally barred from raising the exculpatory witness claim and,

alternatively, any failure to properly assert the claim in Hyman I was due to

ineffective assistance of appellate counsel; (2) he was not procedurally barred from

raising the dual representation claim and, alternatively, any failure to properly

assert the claim in Hyman II was due to ineffective assistance of counsel owing to

Warmack’s conflict of interest; (3) the trial court’s material factual findings were

entered pursuant to an incorrect evidentiary standard and are not supported by the

 - 18 -
 STATE V. HYMAN

 Opinion of the Court

evidence; and (4) defendant was denied his right to effective assistance of counsel and

is entitled to relief under Sullivan or, alternatively, under Strickland.

 II. Discussion

 We review the trial court’s rulings on motions for appropriate relief “to

determine ‘whether the findings of fact are supported by evidence, whether the

findings of fact support the conclusions of law, and whether the conclusions of law

support the order entered by the trial court.’ ” State v. Frogge, 359 N.C. 228, 240, 607

S.E.2d 627, 634 (2005) (quoting State v. Stevens, 305 N.C. 712, 720, 291 S.E.2d 585,

591 (1982)). The trial court’s findings of fact “are binding on appeal if they are

supported by competent evidence.” State v. Morganherring, 350 N.C. 701, 714, 517

S.E.2d 622, 630 (1999). The trial court’s conclusions of law, however, “ ‘are fully

reviewable on appeal.’ ” State v. Lutz, 177 N.C. App. 140, 142, 628 S.E.2d 34, 35

(2006) (quoting State v. Wilkins, 131 N.C. App. 220, 223, 506 S.E.2d 274, 276 (1998)).

 A.

 We first address whether the trial court erred in applying a procedural bar to

defendant’s exculpatory witness claim.

 N.C. Gen. Stat. § 15A-1419(a) (2015) provides four grounds for the denial of a

motion for appropriate relief, including: “Upon a previous appeal the defendant was

in a position to adequately raise the ground or issue underlying the present motion

but did not do so.” N.C. Gen. Stat. § 15A-1419(a)(3). Where such grounds exist, the

 - 19 -
 STATE V. HYMAN

 Opinion of the Court

trial court must deny the motion unless the defendant can show (1) “good cause for

excusing the grounds for denial” and “actual prejudice resulting from the defendant’s

claim”; or that (2) the “failure to consider the defendant’s claim will result in a

fundamental miscarriage of justice.” N.C. Gen. Stat. § 15A-1419(b) (2015).

 The statute clarifies that “good cause” exists only where “the defendant

establishes by a preponderance of the evidence that his failure to raise the claim or

file a timely motion was,” among other reasons, due to “ineffective assistance of trial

or appellate counsel.” N.C. Gen. Stat. § 15A-1419(c)(1) (2015). And to demonstrate

“actual prejudice,” the defendant must show “by a preponderance of the evidence that

an error during the trial or sentencing worked to the defendant’s actual and

substantial disadvantage, raising a reasonable probability, viewing the record as a

whole, that a different result would have occurred but for the error.” N.C. Gen. Stat.

§ 15A-1419(d) (2015). Finally, the trial court’s failure to consider the otherwise

barred claim results in “a fundamental miscarriage of justice” only if “[t]he defendant

establishes that more likely than not, but for the error, no reasonable fact finder

would have found the defendant guilty of the underlying offense.” N.C. Gen. Stat. §

15A-1419(e)(1) (2015).

 The trial court concluded that defendant’s claim was procedurally barred

under N.C. Gen. Stat. § 15A-1419(a)(3). In the record on appeal in Hyman I,

defendant included the following assignment of error:

 - 20 -
 STATE V. HYMAN

 Opinion of the Court

 10. Defendant was denied the assistance of counsel because
 his attorney failed to withdraw from representation when
 it became apparent that she had a conflict of interest.

The trial court viewed defendant’s tenth assignment of error as “a clear indication

that defendant contemplated arguing an ineffective assistance of counsel claim based

upon Ms. Smallwood’s failure to withdraw and testify.” In his appellate brief,

however, defendant “did not identify what he is now squarely raising in Claim 1(b)

as a ground for reversal on appeal.” While “defendant made references in the body of

his brief to Ms. Smallwood’s failure to withdraw and testify,” he did so under the

following assignment of error: “The trial court erred in failing to conduct a hearing

when the court became aware of a conflict of interest on the part of one of defendant’s

attorneys who had previously represented Derrick Speller, one of the State’s

witnesses.” The trial court concluded, therefore, that defendant’s claim was

procedurally barred because he was in a position to adequately raise his claim in

Hyman I but failed to do so. The court further concluded that because defendant’s

claim was meritless, “the procedural bar has not been excused pursuant to N.C.G.S.

§ 15A-1419(b) by showing good cause and actual prejudice, or that a fundamental

miscarriage of justice would occur for this Court’s failure to review the barred claim.”

 An examination of defendant’s “references” to the exculpatory witness claim

within his first appellate brief, alluded to by the trial court, reveals the extent to

which defendant attempted to raise the claim on appeal in Hyman I:

 - 21 -
 STATE V. HYMAN

 Opinion of the Court

 Defense counsel Smallwood had a conflict of interest in
 that she was in possession of information which could be
 used to impeach Derrick Speller, one of the State’s most
 crucial witnesses. This information consisted of
 statements he made to her implicating Demetrius Jordan
 and exonerating Defendant, which directly contradicted
 his testimony at trial. Although she chose to remain as
 counsel and used the information she acquired in her
 representation of Speller to impeach his testimony, rather
 than withdrawing as counsel and testifying as a witness, it
 is not at all clear that this was the correct decision. It is
 certainly arguable that the information she had to impart
 would have carried more weight had she been on the stand
 testifying under oath. Nor is it clear that Defendant was
 aware of the conflict and had acquiesced in counsel’s
 actions.

Reviewing defendant’s brief with the benefit of hindsight, it would have been more

helpful had defendant argued his claim pursuant to the tenth assignment of error.

Nevertheless, the foregoing excerpt from his brief and a fair reading of the cases cited

for support therein, see, e.g., State v. Green, 129 N.C. App. 539, 551–52, 500 S.E.2d

452, 459–60 (1998) (holding that trial court properly conducted an inquiry into

conflict of interest owing to counsel’s decision not to pursue line of questioning which

could have required counsel himself to withdraw and testify), indicates that the Court

could have addressed the claim as it was presented despite the formerly rigid rule of

appellate procedure requiring assignments of error. While perhaps unartfully,

defendant adequately raised the exculpatory witness claim when he was first in a

position to do so. That the issue was never explicitly addressed thereafter—for

 - 22 -
 STATE V. HYMAN

 Opinion of the Court

whatever reason—should not bar defendant’s claim under N.C. Gen. Stat. § 15A-

1419(a), and the trial court erred in concluding otherwise.

 B.

 Next, we address defendant’s challenge to the trial court’s material factual

findings regarding the conversation between Smallwood and Speller.

 The trial court found that defendant offered no credible evidence at the MAR

hearing that Smallwood transcribed the handwritten notes contemporaneously with

any conversation she had with Speller, that the purported conversation took place on

20 November 2001, or that the conversation ever took place. Based solely upon

Smallwood’s notes and her cross-examination of Speller at trial, the court also could

not “definitely find” any of the foregoing had occurred, implying that Smallwood

fabricated the evidence at trial. Relying on these findings, the court concluded that

there was no evidence to support defendant’s exculpatory witness claim.

 At an evidentiary hearing on a motion for appropriate relief, “the moving party

has the burden of proving by a preponderance of the evidence every fact essential to

support the motion.” N.C. Gen. Stat. § 15A-1420(c)(5) (2015) (emphasis added). As

defendant points out, therefore, he was not required to “definitely” prove that

Smallwood transcribed the handwritten notes contemporaneously with any

conversation she had with Speller, that the purported conversation took place on 20

November 2001, or that the conversation ever took place. More importantly, that the

 - 23 -
 STATE V. HYMAN

 Opinion of the Court

court was unable to “definitely find” any of the foregoing occurred is not dispositive

of defendant’s exculpatory witness claim.

 It is undisputed that, at the time of defendant’s trial, Smallwood possessed

evidence tending to show that Speller made a prior inconsistent statement concerning

the identity of the shooter. The exculpatory witness claim raised in defendant’s MAR

was whether Smallwood’s failure to withdraw and testify as to that alleged prior

inconsistent statement constitutes ineffective assistance of counsel. Evidence that

Smallwood was privy to a conversation in which Speller identified the shooter as

someone other than defendant would have been both relevant and material had it

been offered at trial. Admissibility is, of course, a separate issue but one that does

not depend upon a preliminary finding by the court that a witness’s testimony is

credible. See N.C. Gen. Stat. § 8C-1, Rule 104(e) (2015) (“This rule does not limit the

right of a party to introduce before the jury evidence relevant to weight or

credibility.”).

 If otherwise competent, therefore, Smallwood’s testimony would have been

admissible and within the purview of the jury to assign weight and credibility thereto.

See State v. Scott, 323 N.C. 350, 353, 372 S.E.2d 572, 575 (1988) (“The credibility of

the witnesses and the weight to be given their testimony is exclusively a matter for

the jury.” (citing State v. Wilson, 293 N.C. 47, 235 S.E.2d 219 (1977))); State v.

Gamble, ___ N.C. App. ____, ____, 777 S.E.2d 158, 165 (Oct. 6 2015) (No. COA15-71)

 - 24 -
 STATE V. HYMAN

 Opinion of the Court

(“The witness’s credibility is a matter for the court when the only testimony justifying

submission of the case to the jury is inherently incredible and in conflict with [the

proponent’s] own evidence.” (citations and internal quotation marks omitted)). The

jury could have believed Smallwood’s testimony, in which case her failure to

withdraw and testify would tend to support defendant’s claim for ineffective

assistance of counsel. Because the trial court’s findings were not germane to the

adjudication of defendant’s exculpatory witness claim, they do not support its

conclusion that defendant’s claim is meritless for lack of evidentiary support.

 C.

 Next, we address the substance of defendant’s exculpatory witness claim and

his challenge to the trial court’s conclusions that he received effective assistance of

counsel despite Smallwood’s failure to withdraw and testify at trial.

 Defendant maintains that he received ineffective assistance of counsel due to

Smallwood’s failure to withdraw as counsel and testify as to Speller’s alleged prior

inconsistent statement regarding the identity of the shooter. In her role as counsel,

Smallwood’s questions on cross-examination could not be considered evidence by the

jury. Therefore, defendant argues, when Speller denied the prior inconsistent

statement during cross-examination, Smallwood had an actual conflict of interest

between continuing as counsel or withdrawing to testify as a necessary witness.

Defendant contends that because Smallwood’s actual conflict of interest adversely

 - 25 -
 STATE V. HYMAN

 Opinion of the Court

affected her performance as counsel, he is entitled to relief under Sullivan, 446 U.S.

at 348. Alternatively, defendant claims he is entitled to relief under Strickland, 466

U.S. at 687, because Smallwood’s decision to remain as counsel fell below an objective

standard of reasonableness and prejudiced his defense.

 A criminal defendant’s Sixth Amendment right to counsel means “the right to

the effective assistance of counsel.” McMann v. Richardson, 397 U.S. 759, 771 n.14

(1970). Effective assistance of counsel includes a “right to representation that is free

from conflicts of interest.” Wood v. Georgia, 450 U.S. 261, 271 (1981) (citations

omitted). In counsel’s role, he or she owes the client a duty of loyalty, which is

“perhaps the most basic of counsel’s duties.” Strickland, 466 U.S. at 688, 692.

 To prevail on a claim of ineffective assistance of counsel, a defendant typically

must show that “counsel’s performance was deficient” and “the deficient performance

prejudiced the defense.” Id. at 687; see also State v. Braswell, 312 N.C. 553, 562–63,

324 S.E.2d 241, 248 (1985) (adopting the standard set forth in Strickland to review

claims of ineffective assistance of counsel under the North Carolina Constitution).

The U.S. Supreme Court has applied a different standard, however, to review claims

of ineffective assistance of counsel based upon a conflict of interest. Sullivan, 446

U.S. at 349–50. Under Sullivan, a defendant who “shows that his counsel actively

represented conflicting interests” and that “conflict of interest actually affected the

adequacy of his representation need not demonstrate prejudice in order to obtain

 - 26 -
 STATE V. HYMAN

 Opinion of the Court

relief.” Id.; see also Mickens v. Taylor, 535 U.S. 162, 172–73 (2002); State v.

Choudhry, 365 N.C. 215, 219, 717 S.E.2d 348, 352 (2011). A presumption of prejudice

arises because “it is difficult to measure the precise effect on the defense of

representation corrupted by conflicting interests.” Strickland, 466 U.S. at 692.

 The North Carolina Supreme Court has previously addressed whether an

attorney’s decision not to withdraw and testify as a witness for his client created an

actual conflict of interest reviewable under Sullivan rather than Strickland. In State

v. Phillips, 365 N.C. 103, 711 S.E.2d 122 (2011), the defendant moved to suppress

evidence of his confession because “he was substantially impaired from drugs and

alcohol and unable to understand the consequences of his actions when he waived his

Miranda rights.” Id. at 109–11, 711 S.E.2d at 130–31. The police chief, Gary

McDonald, had apparently told the defendant’s attorney, Bruce Cunningham, that

the defendant was “stoned out of his mind” when he confessed to shooting four people.

Id. at 115, 117, 711 S.E.2d at 133, 134. When Cunningham confronted Chief

McDonald about the alleged statement on cross-examination and presented

handwritten notes of the conversation, Chief McDonald testified that he did not recall

making the statement. Id. at 117–18, 711 S.E.2d at 134–35.

 The defendant appealed his conviction, arguing that he was deprived of his

Sixth Amendment right to conflict-free counsel because Cunningham “failed to

withdraw and testify as a witness for defendant, depriving him of conflict-free

 - 27 -
 STATE V. HYMAN

 Opinion of the Court

counsel.” Id. at 116–17, 711 S.E.2d at 134. He claimed that “a withdrawal was

necessary because attorney Cunningham remembered Chief McDonald making

certain statements to Cunningham that Chief McDonald did not himself recall.” And

because Cunningham could not serve as both an advocate and a necessary witness at

trial, see N.C. St. B. Rev. R. Prof. Conduct 3.7 (“Lawyer as a Witness”), 2017 Ann. R.

N.C. 1242, Cunningham had an “actual conflict of interest” which entitled the

defendant to relief under Sullivan. Id. at 117–18, 711 S.E.2d at 135. Our Supreme

Court concluded, however, that the defendant’s claim should be reviewed under

Strickland:

 The applicability of the Sullivan line of cases has been
 carefully cabined by the United States Supreme Court.
 “The purpose of our Holloway and Sullivan exceptions from
 the ordinary requirements of Strickland . . . is not to
 enforce the Canons of Legal Ethics, but to apply needed
 prophylaxis in situations where Strickland itself is
 evidently inadequate to assure vindication of the
 defendant’s Sixth Amendment right to counsel.” Here,
 unlike the circumstances posited in Holloway where
 counsel has been effectively silenced and any resulting
 harm difficult to measure, defendant has identified the
 single matter to which attorney Cunningham could have
 testified had he withdrawn as counsel. Because the facts
 do not make it impractical to determine whether defendant
 suffered prejudice, we conclude that Strickland’s
 framework is adequate to analyze defendant’s issue.

Id. at 121–22, 711 S.E.2d at 137 (quoting Mickens, 535 U.S. at 176).

 Guided if not bound by Phillips, we believe Strickland provides an adequate

framework to review defendant’s exculpatory witness claim. Despite Smallwood’s

 - 28 -
 STATE V. HYMAN

 Opinion of the Court

prior representation of Speller, the record shows that the purported conversation

between Smallwood and Speller “took place from an investigatory standpoint” in

preparation for defendant’s trial. Because that conversation was outside the scope of

her representation, Smallwood would not have bound by a duty of confidentiality. By

the same token, Smallwood was not “effectively silenced” from testifying about the

conversation and the information she learned from Speller. As the facts of this case

do not “make it impractical to determine whether defendant suffered prejudice,”

Phillips, 365 N.C. at 122, 711 S.E.2d at 137, we apply Strickland’s framework to

evaluate defendant’s exculpatory witness claim.

 As stated above, Strickland requires a defendant to first show that “counsel’s

performance was deficient.” Strickland, 466 U.S. at 687. To establish deficient

performance, the defendant “must demonstrate that counsel’s representation ‘fell

below an objective standard of reasonableness.’ ” Wiggins v. Smith, 539 U.S. 510, 521

(2003) (quoting Strickland, 466 U.S. at 688); see also State v. Allen, 360 N.C. 297, 316,

626 S.E.2d 271, 286, cert. denied, 549 U.S. 867 (2006).

 The trial court concluded that defendant could not demonstrate deficient

performance because Smallwood’s testimony would not have been admissible at trial.

And even if it would have been admissible, the court concluded, Smallwood could only

have testified that “Demet had a .380” and “[h]e shot the guy and ran out the back

door.” We disagree.

 - 29 -
 STATE V. HYMAN

 Opinion of the Court

 Our common law rules have restricted the use of extrinsic evidence to impeach

the credibility of a witness. As articulated in State v. Stokes, 357 N.C. 220, 581 S.E.2d

51 (2003), a case decided prior to defendant’s murder trial, “when a witness is

confronted with prior statements that are inconsistent with the witness’ testimony,

the witness’ answers are final as to collateral matters, but where the inconsistencies

are material to the issue at hand in the trial, the witness’ testimony may be

contradicted by other testimony.” Id. at 226, 581 S.E.2d at 55 (citing State v. Green,

296 N.C. 183, 192–93, 250 S.E.2d 197, 203 (1978)); see also 1 Kenneth S. Broun,

Brandis & Broun on North Carolina Evidence §§ 159–61 (7th ed. 2011). If the prior

inconsistent statement relates to a material matter, then it “may be proved by other

witnesses without first calling [it] to the attention of the main witness on cross-

examination.” Green, 296 N.C. at 193, 250 S.E.2d at 203 (citations omitted). If it is

collateral but tends to show bias, motive, or interest of the witness, the inquirer must

first confront the witness with the “prior statement so that he may have an

opportunity to admit, deny or explain it.” Id.; see also State v. Long, 280 N.C. 633,

639, 187 S.E.2d 47, 50 (1972). If the witness denies making the statement, “the

inquirer is not bound by the witness’s answer and may prove the matter by other

witnesses.” Green, 296 N.C. at 193, 250 S.E.2d at 203.

 It cannot seriously be disputed that the identity of the shooter was a material

issue in defendant’s murder trial. Smallwood, who possessed evidence of Speller’s

 - 30 -
 STATE V. HYMAN

 Opinion of the Court

prior inconsistent statement regarding the shooter’s identity, was not bound to accept

Speller’s answers on cross-examination. Smallwood’s testimony, had it been offered,

would have been admissible to impeach Speller by showing that he had previously

identified Jordan as the shooter. And contrary to the trial court’s conclusion, we do

not believe such exculpatory evidence would have been inconsequential so as to

justify Smallwood’s failure to withdraw.

 Smallwood’s testimony would have also been admissible to show Speller’s bias

or interest in the trial. Jordan was initially charged with Bennett’s murder and spent

two years in jail before he was released. Speller testified that he and Jordan

“work[ed] the same job.” After the charges against Jordan were dropped, he sent

Speller to the district attorney to offer a statement implicating defendant in the

murder. The trial court even expressed concern over this aspect of the case during

the charge conference:

 I think Mr. Jordan’s credibility is at issue in this case . . . .
 At least one of your witnesses—one of your very key
 witnesses . . . Derrick Speller testified that he came to you
 as a result of what Demetrius Jordan said to him, if I’m not
 mistaken. Demetrius Jordan told him to go see you. Had
 it not been for that he may not even have been involved in
 the case. So the question is, why is Demetrius Jordan
 running around rounding up witnesses for the State.

 At the same time . . . you have a situation where the State
 of North Carolina has dismissed very serious cases against
 Mr. Jordan—a case of second-degree murder—and allowed
 him to plea to something much less to the point where he
 is now out of jail . . . .

 - 31 -
 STATE V. HYMAN

 Opinion of the Court

Speller testified at trial that he never gave a statement to police because “nobody

never asked me.” That explanation was different than what Smallwood had dictated

in her notes: “[Speller] never gave a statement to the police because he hustled for

Demet and Turnell and them niggers are lethal.”

 While the admissibility of Smallwood’s testimony does not in and of itself

establish deficient performance, the circumstances surrounding her decision to

remain as counsel leads us to that conclusion. Smallwood was the only witness to

Speller’s prior inconsistent statement. Her questions to Speller could not be

considered as evidence and, after her ineffective cross-examination, she became a

necessary witness at trial with a duty to withdraw. See N.C. St. B. Rev. R. Prof.

Conduct 3.7(a) (“A lawyer shall not act as an advocate at a trial in which the lawyer

is likely to be a necessary witness . . . .”), 2017 Ann. R. N.C. 1242. Her testimony

undoubtedly related to a contested issue in the case and tended to discredit one of the

State’s two key witnesses. High could have remained as defendant’s counsel and the

court could have appointed a second attorney even if it meant declaring a mistrial.

By failing to withdraw and testify, Smallwood’s conduct fell below an objective

standard of reasonableness and was deficient under Strickland.

 Next, we address whether defendant satisfied the requisite showing of

prejudice for relief under Strickland. To show prejudice, a “defendant must show

that there is a reasonable probability that, but for counsel’s unprofessional errors,

 - 32 -
 STATE V. HYMAN

 Opinion of the Court

the result of the proceeding would have been different. A reasonable probability is a

probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S.

at 694.

 The trial court concluded that defendant could not establish prejudice in light

of Smallwood’s “effective cross-examination” of Speller, Wilson’s testimony, and the

State’s cross-examination of D. Pugh based upon his prior inconsistent statement to

law enforcement. We disagree.

 If Smallwood had properly withdrawn, she could have testified that Speller,

one of only two key witnesses for the State, had previously told her that it was

Jordan—not defendant—who shot Bennett. She could have attacked Speller’s

credibility through his prior inconsistent statement and evidence of his interest in

the trial. Her testimony tended to discredit nearly half the State’s case and, in

conjunction with the testimony of L. Pugh and D. Pugh, would have provided an

evidentiary advantage to the defense.

 Wilson, the only other witness to identity defendant as the shooter, had his

own credibility issues. He had testified as a State’s witness in the past and, during

defendant’s trial, revealed that he had been convicted of breaking and entering, two

counts of second-degree burglary, larceny of a firearm, larceny of a motor vehicle, four

counts of driving while license revoked, four counts of driving while impaired, two

counts of injury to property, communicating threats, assault with a deadly weapon,

 - 33 -
 STATE V. HYMAN

 Opinion of the Court

and forgery and uttering—all within the last ten years. Judge Grant even remarked

at the MAR hearing: “We all know Robert Wilson. . . . And a record like that, right,

we know him.”

 The State’s cross-examination of D. Pugh also does not foreclose a showing of

prejudice. D. Pugh denied making a prior inconsistent statement to police, asserting

that when he was arrested days after the murder on unrelated charges, police gave

him a blank sheet of paper to sign and initial, which he did, and they later wrote out

a statement implicating defendant. The statement was not introduced at trial, and

despite the State’s cross-examination, D. Pugh’s testimony implicating Jordan as the

shooter would nevertheless have bolstered Smallwood’s impeachment evidence

against Speller.

 Finally, we agree with defendant that, as a practical matter, Smallwood’s

testimony could have rehabilitated her own credibility as an advocate at trial, which

has been described as “[a] cardinal tenet of successful advocacy.” State v. Moorman,

320 N.C. 387, 400, 358 S.E.2d 502, 510 (1987). Even from a cold record we can tell

that Smallwood’s cross-examination was, in defendant’s own words, “disastrous.”

Speller denied her every attempt to establish that he had given a prior inconsistent

statement or that their conversation took place. His steadfast repudiation bolstered

his own credibility and impeached Smallwood’s credibility as an advocate. In a case

that came down to the credibility of the witnesses, there is a reasonable probability

 - 34 -
 STATE V. HYMAN

 Opinion of the Court

that, had Smallwood withdrawn and testified as to Speller’s prior inconsistent

statement, the result would have been different.

 III. Conclusion

 We conclude that defendant was denied his right to effective assistance of

counsel based upon Smallwood’s failure to withdraw and testify as a necessary

witness at trial. Because defendant is entitled to relief under Strickland on his

exculpatory witness claim, we need not address his remaining arguments to this

Court. The trial court’s order denying his MAR is reversed.

 REVERSED.

 Judge HUNTER, JR. concurs.

 Judge DILLON dissents by separate opinion.

 - 35 -
 No. COA16-398 – STATE v. HYMAN

 DILLON, Judge, dissenting.

 My vote is to affirm Judge Grant’s order denying Defendant’s motion for

appropriate relief (“MAR”). Therefore, I respectfully dissent.

 Defendant was charged with the murder of Ernest Bennett, who was shot and

killed at a nightclub. At Defendant’s trial, the State’s evidence included the

testimony of two eyewitnesses, both of whom stated that they saw Defendant shoot

the victim. Defendant’s evidence included the testimony of an eyewitness who stated

that he saw another man, Demetrius Jordan, shoot the victim. The jury found

Defendant guilty, and Defendant’s conviction was upheld by this Court in a prior

appeal.

 More recently, Defendant filed an MAR for a new trial. Defendant’s MAR was

denied by the trial court, and Defendant appealed.

 Defendant’s arguments at his MAR hearing and on appeal concern an alleged

conversation that one of Defendant’s attorneys, Teresa Smallwood, had with one of

the State’s witnesses prior to trial. On direct, after the State witness testified that

he saw Defendant shoot the victim, he further testified that he had spoken with Ms.

Smallwood about the shooting prior to the trial. Ms. Smallwood cross-examined the

State witness about the prior conversation, suggesting during her questioning that

the State witness had told her that he had seen Demetrius Jordan, and not

Defendant, shoot the victim. Ms. Smallwood also attempted to show the State

witness her “notes” from their alleged conversation; however, the trial court did not
 STATE V. HYMAN

 DILLON, J., dissenting

allow her to do so. Throughout Ms. Smallwood’s cross-examination, the State witness

remained steadfast in his testimony that he saw Defendant kill the victim.

 Defendant essentially argues two points in this MAR phase. First, he makes

an “exculpatory witness claim,” contending that Ms. Smallwood should have

withdrawn and then offered testimony to impeach the testimony of the State witness.

Second, he makes an ineffective assistance of counsel (“IAC”) claim, contending that

Ms. Smallwood should have withdrawn and testified and that his appellate attorney

failed to argue this point in the first appeal.

 I. Exculpatory Witness Claim

 The State contends that Defendant’s exculpatory witness claim is procedurally

barred because the claim could have been raised in Defendant’s prior appeal. The

majority concludes that Defendant did raise this claim, though inartfully, in his

appellate brief in the prior appeal. However, our Court apparently did not recognize

that the claim was being argued in the prior appeal, as our Court did not address the

claim in its opinion.

 My view is that Defendant’s exculpatory witness claim is barred in either case.

That is, if Defendant’s “inartful” brief failed to make an exculpatory witness claim,

then Defendant is procedurally barred because he could have raised it. Alternatively,

if Defendant’s brief did raise an exculpatory witness claim, Defendant is still

procedurally barred because he failed to raise it through a petition for rehearing to

 2
 STATE V. HYMAN

 DILLON, J., dissenting

this Court following the issuance of our prior opinion, which ostensibly ignored his

claim. Our Appellate Rule 31 provides that a party may file a petition for rehearing

after an opinion to argue “the points of fact or law that, in the opinion of the

petitioner, the [Court of Appeals] overlooked or misapprehended and shall contain

such argument in support of the petition as petitioner desires to present.” N.C. R.

App. P. 31. However, Defendant did not petition this Court for rehearing to consider

his exculpatory witness claim that he now contends we overlooked.

 Defendant argues that he was still entitled to have his exculpatory witness

claim reviewed in an MAR hearing, notwithstanding that he could have raised it in

the prior appeal. Specifically, he contends that the trial court’s failure to review his

claim resulted in a fundamental miscarriage of justice. We disagree.

 Here, Defendant has failed to establish that “more likely than not, but for the

error, no reasonable fact finder would have found the defendant guilty of the

underlying offense[.]” N.C. Gen. Stat. § 15A-1419(e)(1). As discussed more fully in

the IAC section below, Defendant did not present evidence to show exactly what Ms.

Smallwood would have said had she taken the stand. Even if she had testified that

she remembered the State witnesss informing her that he did not see Defendant shoot

the victim, I believe that it still would not have been unreasonable for the jury to

convict. The jury could have lent very little weight to Ms. Smallwood’s testimony; see

Ward v. Carmona, 368 N.C. 35, 37, 770 S.E.2d 70, 72 (2015) (“The function of the jury

 3
 STATE V. HYMAN

 DILLON, J., dissenting

is to weigh the evidence and determine the credibility of any witnesses.”); for

instance, her timesheets do not reflect that she had any interaction with the State

witness on the day that her “notes” indicate that she met with him. In addition, the

testimony of the State witness was corroborated by the testimony of another

eyewitness.

 II. Ineffective Assistance of Counsel Claim

 I do not believe that the trial court erred in its conclusion regarding

Defendant’s IAC claims. Defendant failed to present evidence at the MAR hearing to

show a reasonable probability that a different result would have occurred had Ms.

Smallwood withdrawn and then attempted to testify or had his appellate counsel filed

a petition for rehearing with this Court to consider his exculpatory witness claim.

 To establish reasonable probability, it was Defendant’s burden at the MAR

hearing to show exactly what the substance of Ms. Smallwood’s testimony would have

been. Otherwise, it is impossible on review to determine whether Ms. Smallwood’s

testimony would have been admissible and what impact it might have had. But as

Judge Grant points out in his Order, Defendant did not present Ms. Smallwood as a

witness at the MAR hearing. No one else testified at the MAR hearing with any detail

as to what Ms. Smallwood would have stated had she been allowed to take the stand.

There is no competent evidence in the record to demonstrate that Ms. Smallwood had

any independent recollection that the State witness told her that he saw someone

 4
 STATE V. HYMAN

 DILLON, J., dissenting

other than Defendant kill the victim or whether her “notes” from the alleged

conversation would have refreshed her memory. It may be that Ms. Smallwood would

have offered admissible, persuasive testimony to impeach the State witness.

However, Defendant simply failed to meet his burden of proof to show as much at the

MAR hearing.

 At the MAR hearing, Defendant did offer a copy of the “notes” which Ms.

Smallwood attempted to show the State witness at trial. However, these notes are

not admissible to show how Ms. Smallwood might have testified. The notes do not

suggest that the State witness told Ms. Smallwood that he saw Demetrius Jordan fire

the fatal shot. Rather, the notes suggest, at best, that the State witness told Ms.

Smallwood that he did not see who fired the fatal shot, after Demetrius Jordan had

fled the scene.2

 I conclude that Judge Grant’s conclusions are supported by his findings.

Accordingly, my vote is to affirm the trial court’s order.

 2 The State stresses that Judge Grant found that Defendant, at the MAR hearing, failed to
produce any credible evidence that the alleged conversation between Ms. Smallwood and the State
witness ever took place. However, I do not view as relevant whether Judge Grant believed the
conversation took place. Rather, what is relevant is how Ms. Smallwood would have testified
concerning the alleged conversation, leaving it to the jury to make any credibility determination
regarding what, if anything, the State witness told Ms. Smallwood prior to trial.

 5